IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BEVERLY BUTLER-BURNS, | ) |
| Plaintiff, | ) Case No. 16 C 4076 |
| v. | ) Judge Virginia M. Kendall |
| BOARD OF TRUSTEES OF THE COMMUNITY COLLEGE DISTRICT NO. 508, COUNTY OF COOK, STATE OF ILLINOIS, a/k/a CITY COLLEGES OF CHICAGO | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Beverly Butler-Burns brings suit against her former employer Defendant City Colleges of Chicago alleging that she was discriminated against and ultimately terminated on the basis of her age and race in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (Count I); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Count II); and 42 U.S.C. § 1983 (Count III). Currently before the Court is Defendant's motion for summary judgment. (Dkt. 53). For the reasons set forth below, Defendant's motion is granted in part and denied in part.

## BACKGROUND[1]

Defendant is a community college district established pursuant to the Illinois Public Community College Act, 110 ILCS 805/1-1 *et seq.*, that operates seven community colleges in Cook County, Illinois. Plaintiff, an African-American woman, began working for Defendant in

---

[1] The Court takes the relevant facts from the parties' Local Rule ("LR") 56.1 statements of undisputed material facts and supporting exhibits: (1) Defendant's LR 56.1 Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment (Dkt. 55), Plaintiff's LR 56.1(b)(3)(B) Response to Defendant's Statement of Facts in Support of its Motion for Summary Judgment (Dkt. 56), Plaintiff's LR 56.1(b)(3)(C) Statement of Additional Facts Requiring Denial of Defendant's Motion for Summary Judgment (Dkt. 57), and Defendant's Response to Plaintiff's Statement of Additional Facts (Dkt. 62). The following facts are undisputed except where otherwise noted.

November 2010 when she was 56. Plaintiff first held two part-time positions at the Harold Washington Institute before she accepted a position as Labor & Employee Relations Specialist-DO ("LERS"), a full-time position in Human Resources at the District Office, in December 2012. Her starting salary was $60,000. (Dkt. 55) at ¶¶ 14, 15. As a LERS, Plaintiff was hired and supervised by Aaron Allen, an African-American man over forty years of age. Allen reported to Stephanie Tomino, the Vice Chancellor of Human Resources.

The job description for the LERS position listed eleven "qualifications" for the position, including:

1. Master of Science degree from an accredited college or university with a concentration in Labor Relations, Employee Relations, Human Resource Administration or similar field. Juris Doctorate preferred, or a combination of training and experience required.

2. At least (3) three years of professional experience in labor relations, employee relations, or human resources administration required.

3. Must possess familiarity with employment laws and the ability to assess evidence and arrive at a fair conclusion in accordance with the District's Equal Opportunity Policy and other policies, work rules, and applicable laws.

\* \* \*

6. Must possess excellent verbal and written communication skills.

(Dkt. 55-2) at 47–49 (City Colleges of Chicago Job Description for Labor & Employment Relations Specialist-DO Revised 7/31/12); *see also id.* at 50–52 (City Colleges of Chicago Job Description for Labor & Employment Relations Specialist-PT Revised 2/16/12) (listing the same qualifications). Plaintiff has a Master's Degree in Human Resource Management and Development, and she held human resource management positions at CNA Financial, Coca-Cola, and Sherwin Williams continuously from 1996 to 2010. (Dkt. 62) at ¶¶ 2–3; *see also* (Dkt. 62-1) at 22–24 (Butler-Burns resume). The parties do not dispute that Plaintiff met the minimum qualifications for the LERS position. *See* (Dkt. 62) at ¶ 1.

During Plaintiff's time as a LERS, three other employees also held this position: Konstantina Christopoulos, Sarah Levee-Nau, and Leia DeVita. Christopoulos was a part-time LERS who was hired in 2009 at a salary of $40/hour. She was 28-years old when she was hired (making her 33 when Plaintiff was discharged in September 2014), and she is not African American. In addition, Christopoulos has a law degree. (Dkt. 55) at ¶¶ 8, 10; (Dkt. 56) at ¶ 10. Levee-Nau was hired as a full-time LERS with a starting salary of $72,000 in March 2013, when she was 35-years old (making her 36 when Plaintiff was discharged). Levee Nau is not African American and she has a law degree. (Dkt. 55) at ¶ 17; (Dkt. 56) at 17. Finally, DeVita was hired as a full-time LERS with a starting salary of $60,000 in April 2013, when she was 27-years old (making her 28 when Plaintiff was discharged). DeVita is not African American and she has a law degree. (Dkt. 55) at ¶ 18; (Dkt. 56) at ¶ 18. Accordingly, in September 2014, Plaintiff was the longest serving full-time LERS, and she was also the only LERS without a law degree.[2]

Among the job responsibilities for a LERS were investigating alleged violations of Defendant's Equal Opportunity policy, investigating employee relations complaints, preparing investigative reports with findings and recommended outcomes, and conducting supervisory training. (Dkt. 55) at ¶ 7. Although Plaintiff did not receive any feedback critical of her work or behavior and, despite Defendant's admission in this proceeding that Plaintiff was satisfactorily performing her job duties ((Dkt. 62) at ¶ 12), Defendant contends that her performance was substandard. Specifically, Allen testified in his deposition that he believed that she had a "lower level of analytical skills," she did not grasp employment laws, she was a "weaker performer" than her peers, her writing was not as focused or accurate as it should have been, and she was not

---

[2] Because all three LERS are more than 10 years younger than Plaintiff, they are "substantially younger" for purposes of the ADEA. *See Duncan v. Fleetwood Motor Homes of Ind., Inc.*, 518 F.3d 486, 493 (7th Cir. 2008) (citing *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 322 (7th Cir. 2003)).

3

performing as much work as the other LERS. *Id.* at ¶¶ 23–25, 41. Accordingly, Allen chose not to assign certain duties to Plaintiff, including grievance hearings and contract negotiations. Allen testified that he felt that Plaintiff could not "competently perform" those duties and/or that Plaintiff had demonstrated a certain lack of abilities and skills. *Id.* at ¶ 23. On at least one occasion, Allen told Tomino that Plaintiff was slow to complete her investigation reports. Tomino as well believed that Plaintiff had a low skill level and was a weak LERS. *Id.* at ¶ 27.

On June 16, 2014, Defendant hired Dewayne Howard, an African American man over forty, as Associate Vice Chancellor of Human Resources. In this role, Howard supervised Allen and reported to Tomino. *Id.* at ¶ 28. His primary oversight included (1) labor relations and (2) talent (*i.e.*, recruitment), including talent acquisition and performance management. *Id.* at ¶ 32. At some point, Howard decided that he wanted to "strengthen the talent side of his team in order to build up certain areas including the performance review process." *Id.* at ¶ 33. This involved "allocating additional resources to talent management and acquisition rather than Labor & Employment Relations." *Id.* at ¶ 44.

In September 2014, Defendant announced that it needed to eliminate one LERS position in the District Office. Howard engaged in a staff review, during which he met with all of the office employees including Plaintiff. Defendant asserts that Howard was not left with a "strong impression" of Plaintiff and that he reviewed her work product and found it lacking. *Id.* at ¶¶ 35–36. After speaking with Allen, Howard decided to eliminate Plaintiff's position. Tomino approved of the decision. (Dkt. 55) at ¶ 45. On September 25, 2014, Allen and Howard told Plaintiff that her position was being eliminated. *Id.* at ¶ 47. She was 60 and her salary was $61,500 at that time. In a November 10, 2014 meeting, the Board of Trustees officially approved of Plaintiff's termination. *Id.* at ¶ 48. No other Human Resources Department employees were

4

separated at this same time, and Plaintiff's open cases were reassigned to the other, non-African American and substantially younger LERS. *Id.* at ¶ 50; (Dkt. 62) at ¶ 25. Not long after Plaintiff's position was eliminated, on October 17, 2014, Leeve-Nau was promoted to Associate Director of Labor & Employee Relations (a newly created position) and her salary was increased to $85,000 annually. (Dkt. 55) at ¶ 51; (Dkt. 57) at ¶ 29.

On October 31, 2014, Defendant posted a job opening for a new position in the Direct Office titled Human Resources Coordinator. Plaintiff contends that this position involved some of her job duties, although Defendant asserts that it did not involve any of the substantive duties of a LERS. Nicole Dax, a 29-year old white female who graduated law school in 2013 was hired for this position at a starting salary of $45,000 in January 2015, and she was promoted to full-time LERS on July 13, 2015 by Allen, Howard, and Tomino, at which time her salary was raised to $54,000. (Dkt. 55) at ¶¶ 56, 57; (Dkt. 56) at ¶ 57; (Dkt. 57) at ¶ 31.

In addition to Leeve-Nau's promotion and Dax's hire and promotion, multiple other personnel changes occurred among the LERS after Plaintiff's discharge. DeVita—who had been having performance issues and who had been counseled and coached by Allen and Tomino—and Christopoulos both resigned in early 2015. (Dkt. 55) at ¶¶ 60–61. Defendant hired another white female in her 20s, Logan Deane, as a full-time LERS in September 2015. Deane had graduated from law school in May 2015. *Id.* at ¶ 63; (Dkt. 62) at ¶ 11.

Plaintiff filed a timely charge of discrimination with the EEOC, and she was issued a right to sue letter on January 4, 2016. Plaintiff's second amended complaint brings three claims against Defendant: (1) age discrimination, (2) race discrimination in violation of Title VII, and (3) race discrimination in violation of 42 U.S.C. § 1983. *See* (Dkt. 24). Defendant has moved for summary judgment on all counts. (Dkt. 53).

## LEGAL STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether summary judgment is appropriate, the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor (here, Plaintiff). *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted). Courts do not weigh the evidence or make credibility determinations when deciding motions for summary judgment. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704–05 (7th Cir. 2011).

## DISCUSSION

**A.     ADEA and Title VII Claims (Counts One and Two)**

Title VII prohibits employers from discriminating against "any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Likewise, the ADEA prohibits employers from discriminating against individuals who are over forty-years old on the basis of age. 29 U.S.C. § 623(a)(1). At summary judgment, district courts consider the evidence "as a whole" to determine "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [race or age] . . . caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). A court may review the evidence through the *McDonnell Douglas* burden-shifting framework; but ultimately, the

court must conduct a cumulative review of the evidence to determine whether a reasonable factfinder could find that Plaintiff's age or race was the cause of the adverse employment action. *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

    **1.**    *McDonnell Douglas*

"Generally speaking, under *McDonnell Douglas*, the plaintiff has the initial burden of establishing that '(1) she is a member of a protected class, (2) she performed reasonably on the job in accord with her employer['s] legitimate expectations, (3) despite her reasonable performance, she was subjected to an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably by the employer.'" *Id.* at 225 (citation omitted). This is the same standard that applies to a regular reduction in force (*i.e.*, layoff); when a RIF takes place but is implemented in a discriminatory fashion, the plaintiff's burden is to "show (in addition to the first two elements of the *McDonnell Douglas* claim) that she was discharged and that other, similarly situated employees who were not members of the plaintiff's protected class were treated more favorably." *Bellaver v. Quanex Corp.*, 200 F.3d 485, 494 (7th Cir. 2000). "A RIF occurs when an employer permanently eliminates certain positions from its workforce." *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 693 (7th Cir. 2000). When a plaintiff has been laid off as part of a "mini–RIF" (or a single discharge)—which Defendant argues happened here (*see* (Dkt. 54) at 7)—"the fourth prong of the plaintiff's *prima facie* case is satisfied when the plaintiff demonstrates that her duties were absorbed by persons not in the protected class" regardless of whether those persons were similarly situated to the plaintiff or not. *Bellaver*, 200 F.3d. at 495 ("The plaintiff in a single-discharge case does not need to make a showing that 'similarly situated' employees were treated better because the inference of discrimination arises from the fact that they were constructively

7

'replaced' by workers outside of the protected class); *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 689–90 (7th Cir. 2006). If the plaintiff satisfies that burden of proving all four elements, "then the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *David*, 846 F.3d at 225 (citation omitted). Plaintiff easily satisfies the two prongs of the *prima facie* case: she was 60 when Defendant terminated her. Moreover, Defendant has admitted that Plaintiff was performing her job satisfactorily. *See* (Dkt. 62) at ¶ 12; (60-9) (Respondent's Verified Response) at 2, 3. Defendant argues that Plaintiff cannot satisfy the fourth element of the test.

### a. Similarly Situated Employees

Deciding whether employees are similarly situated is a "flexible, common-sense, and factual" inquiry. *David*, 846 F.3d at 225 (citation omitted). To make this showing, a plaintiff must present a comparator who is similar enough "to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel." *Filar v. Board of Educ. of City of Chicago*, 526 F.3d 1054, 1061 (7th Cir. 2008). Relevant factors include "whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision." *Warren v. Solo Cup Co.*, 516 F.3d 627, 631 (7th Cir. 2008) (quotation omitted). When looking for a similarly situated employee, Plaintiff "need not present a doppelganger who differs only by having remained in the employer's good graces." *Filar*, 526 F.3d at 1061.

Here, Plaintiff points to the substantially younger, non-black LERS as her comparators: Christopoulos, Leeve-Nau, and DeVita—all three of whom held the LERS position at the same

time as Plaintiff, meaning that they had the same job description and performance standards (noting that Christopoulos, who was a part-time employee, worked different hours than Plaintiff) and they were all subordinate to Allen, Howard, and Tomino. Still, Defendant argues that these three women are not suitable comparators because the all had law degrees (while Plaintiff did not) and therefore Plaintiff "lacked the analytical and writing skills that one acquires with a JD." (Dkt. 54) at 8. However, the comparator test is multifaceted, and the simple fact that Plaintiff, who holds a Master's Degree in Human Resources, does not have the same level of legal training that Christopoulos, Levee-Nau, and DeVita had is not enough on its own for the Court to conclude that those three were not similarly situated to Plaintiff. This is not a case where the education and/or skill level of the plaintiff and the proposed comparators are so different as to make them incomparable, *see, e.g.*, *Warren*, 516 F.3d at 631 (in disparate pay case, plaintiff had a high school diploma and proposed comparator had a bachelor's degree, two master's degrees, *and* superior computer skills), or where the plaintiff has conceded a particular lack of relevant skills that his comparators possessed. *See, e.g.*, *Darbha v. Capgemini Am. Inc.*, 492 F. App'x 644, 647 (7th Cir. 2012) (Darbha conceded that he did not have the computer skills needed for the available projects at Capgemini). Not only that, by the phrasing of its argument, Defendant simply assumes that anyone with a law degree has "superior skills" and therefore is automatically a substantially more qualified LERS. But Defendant's assumption is not supported by any other evidence in the record and it is not sufficient establish for purposes of summary judgment that the three comparators actually possessed skills that were so superior to Plaintiff as to make them incomparable. Accordingly, common sense dictates that the three LERS were similarly situated to Plaintiff in many critical respects, and therefore, Plaintiff has submitted sufficient evidence to make out a *prima facie* case of age and/or race discrimination

under the traditional RIF analysis. Even if the Court were to accept Defendant's argument that a law degree makes the three retained LERS incomparable to Plaintiff, Plaintiff has also submitted sufficient evidence to make out the less rigorous *prima facie* case in the mini-RIF setting for which Defendant advocates because there is evidence in the record that Plaintiff's job duties were reallocated among the remaining LERS, all three of whom were outside the protected classes. *See* (Dkt. 55) at ¶ 50.

        **b.**        **Pretext**

After establishing a *prima facie* case of age discrimination, Plaintiff must supply evidence to allow a reasonable jury to determine that Defendant's reason for her layoff was mere pretext. "The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered for the adverse action." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 570 (7th Cir. 2017) (citation omitted); *accord Merillat*, 470 F.3d at 692–93. "A plaintiff can do this by showing that the defendant's reason for the adverse employment action (1) had no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to motivate the action." *Bates v. City of Chicago*, 726 F.3d 951, 956 (7th Cir. 2013) (citing *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1006 (7th Cir. 2002)). Further, the employer's justification need not be a "good reason," but merely an age-neutral or race-neutral one. *Warren*, 516 F.3d at 630 (citations omitted). Here, there are several disputes regarding (1) the necessity of eliminating a LERS position in order to allow an increase in staffing on the talent side of the office, (2) the basis for Allen's, Howard's, and Tomino's beliefs concerning Plaintiff's performance, and (3) Defendant's statement that Plaintiff "lacked work"—disputes that could lead a reasonable jury to find that Defendant's proffered

reason for termination was pretextual. When reviewing the facts in the light most favorable to Plaintiff, these disputes preclude summary judgment.

As a threshold matter, Defendant has provided a number of explanations for Plaintiff's termination. According Defendant's January 2015 position statement to the EEOC, Plaintiff's position was eliminated "for Department efficiency and lack of work because there was no demand for personnel training at the District Office and [Plaintiff] did not conduct grievance hearings as did the other three Labor Relations Specialists who held law degrees." (Dkt. 60-10) (Respondent's Statement of Position) at 3; (Dkt. 62) at ¶ 26. In the current litigation, Defendant's explanation for Plaintiff's termination has been that it was conducting a small reduction-in-force on the human resources side of the District Office to open up space and "free up resources" for increased staffing on the talent side of the office and Plaintiff was the lowest performing LERS. (Dkt. 54) at 9, 12; *see also* (Dkt. 61) at 14 (explaining the reason for the position elimination as "to reallocate resources" and describing Plaintiff has having "weak analytical skills and lackluster work performance"). "As a general rule, a reasonable trier of fact can infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision." *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 577 (7th Cir. 2015); *see also Simple v. Walgreen Co.*, 511 F.3d 668, 671 (7th Cir. 2007) ("The inconsistency is suggestive of pretext and thus is evidence of discrimination."). But these "explanations must actually be shifting and inconsistent to permit an inference of mendacity." *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 577 (7th Cir. 2003); *see Rand v. CF Indus.*, 42 F.3d 1139, 1146 (7th Cir. 1994). Here, the proffered reasons are inconsistent and therefore create an inference of pretext for trial. In any event, Plaintiff has pointed to enough evidence in the record to identify weaknesses,

11

implausibilities, inconsistencies, and contradictions in all of the proffered reasons. *See Coleman v. Donahoe*, 667 F.3d 835, 852–53 (7th Cir. 2012) (citation omitted).

Looking first at the budgetary rationale for Plaintiff's termination, Defendant maintains that it wanted to "re-direct funds toward talent acquisition and management" or "funnel more resources into that area." *See* (Dkt. 54) at 13; (Dkt. 61) at 7. In support of this argument, Defendant points to documents setting for the budget for the District Office Human Resources Department. (Dkt. 61) at 7–8. But these documents only state the *total* amount budgeted for all salaries by year, that is, they do not break out the salaries of the Department's subgroups (labor relations vs. talent) so as to reflect the reallocation of resources Defendant for which argues. *See* (Dkt. 62-6). Not only that, the documents reflect that although the budget for salaries decreased by more than $500,000 from FY13 to FY14, it increased by more than $350,000 from FY14 to FY15, *id.*, and therefore these documents provide little, if any, support for Defendant's rationale. Further, Plaintiff points to evidence that, within one month of her termination, Leeve-Nau was given a more than $10,000/year raise and, within four months of her termination, Dax was brought on as a Human Resources Coordinator (a newly created position) at $45,000/year, only to be promoted to LERS at $54,000/year six months later. Both actions equal more than Plaintiff's ending salary of $61,500. As an additional point on this topic, due to the multiple personnel changes that occurred among LERS in 2015, the parties dispute whether Plaintiff was replaced by someone outside of the protected class—either Dax or Deane.

*Michas v. Health Cost Controls of Ill., Inc.*, cited by Defendant, is distinguishable. (Dkt. 54) at 13. There, the employer put forth evidence to support its claim that its financial interests would be served by reducing expenses in departments considered extraneous (including the legal department where the employee worked) before being acquired, including deposition testimony

regarding the threat of lost business, stagnant net income for a year at issue, and testimony about the need to cut costs in the face of the potential acquisition. 209 F.3d at 694–95. Despite the plaintiff's circumstantial evidence that his termination was based on a discriminatory motive, including evidence that three new employees (one that directly replaced the plaintiff, but who was also part of the protected class) were hired directly after the plaintiff's discharge, the appellate court concluded that the employee had failed to present evidence that the employer "did not believe that it needed to cut costs where it could." *Id*. at 695. By contrast, Defendant here only argues that it wanted to shift resources from one side of its Human Resources Department to another, but it has not provided any evidence akin to that presented in *Michas*.

The second rationale provided for Plaintiff's termination was that her three managers shared an honest belief that she was the weakest performer of the LERS on staff. (Dkt. 54) at 9–10. Here, too, factual disputes, viewed in the light most favorably to Plaintiff, prevent summary judgment. For example, Defendant has put forth testimony from all three managers that they believed that Plaintiff had "a lower level of analytical skills than the other [LERS], [] her writing was not as focused or as accurate as it could have been" (Allen), she was a weak employee and could not handle collective bargaining agreement negotiations because she "never experienced her having any technical knowledge, aptitude, interest, commentary or anything related to a CBA" (Tomino), and that she had writing deficiencies (Howard). *See* (Dkt. 55) at ¶¶ 24, 25, 41; (Dkt. 60-3) (S. Tomino Dep.) at 185:2–17; (Dkt. 60-5) (D. Howard Dep.) at 80:17–82:14. In response, Plaintiff has supplied evidence indicating that her managers' beliefs had no basis in fact, but instead were based on unverified assumptions—particularly evidence and testimony that these feelings were never memorialized on performance reviews or otherwise communicated to her and that her managers could not articulate the bases for their feelings. *See* (Dkt. 56) at ¶¶ 23,

24, 27, 36; *see also* (Dkt. 60-1) (A. Allen Dep.) at 31:1–17; (Dkt. 60-3) at 81:14–20, 82:3–11 (Tomino testified that she never gave Plaintiff "any indication that she was not meeting the requirements of her job" or had direct conversations about Plaintiff's work quality and output quantity, even though Tomino thought such conversations were "warranted"); *see also id*. 185:2–17 (testifying that she thought Plaintiff could not handle contract negotiations but also that she never inquired as to Plaintiff's CBA experience); (Dkt. 60-5) at 80:17–82:14 (Howard testified that he "didn't know specifically" what Plaintiff's writing deficiencies were and that he did not "believe [he had] a basis" for saying that her performance was worse than anyone else's).

As further evidence that Defendant's belief about Plaintiff's performance relative to the other LERS was not honestly held, Plaintiff argues that DeVita had actual and well known performance issues in 2014, although the exact start date of the performance issues is in dispute. The parties agree, however, that DeVita was placed on a formal performance improvement plan in December 2014. (Dkt. 55) at ¶ 58; (Dkt. 56) at ¶ 58. And in response to Defendant's termination rationale that Plaintiff was not performing contract negotiation work, Plaintiff points to evidence that Allen deliberately did not assign her such work and also Defendant's admission that DeVita and Christopoulos also did not participate in contract negotiations. *See* (Dkt. 62) at ¶¶ 13, 16. Thus, Plaintiff has cast sufficient doubt on whether Defendant whether Defendant honestly believed that she was a weak link. This issue will be for the jury to decide.

Third, the parties disagree whether Plaintiff had a light workload. Specifically, although Allen testified that he did not "believe" that Plaintiff was performing as much work as the other LERS (*see* (Dkt. 56) at ¶ 25), Plaintiff points to evidence that Allen had not compared the number of hours worked by the LERS and could not offer a comparison when asked at his deposition. *See* (Dkt. 60-1) at 99:14–101:24. In fact, Plaintiff argues that she had a

comparatively large work load. (Dkt. 56) at ¶ 25; *see also* (Dkt. 60-2) at CC004009 (in October 2014, noting that Plaintiff had 15 cases and the other LERS had 23 cases combined). *But see* (Dkt. 62-5) at CC006655 (noting that as of September 26, 2014, Plaintiff had 21 open cases, 13 of which were "finished"). Further, Tomino testified that she did not know how many cases Plaintiff handled relative to her peers. (Dkt. 56) at ¶ 38; (Dkt. 60-3) at 119:17–120:3.

All in all, these disputes, if resolved in Plaintiff's favor, could convince a jury that Defendant's reallocation-of-resources, weak-performance, and lack-of-work rationales for discharging Plaintiff were pretext for age and/or race discrimination. *See Coleman*, 667 F.3d at 852–53.[3]

### 2. Cumulative Review

Assessing the evidence in the undisputed record cumulatively leads to the same conclusion as reviewing the evidence through the *McDonnell Douglas* framework: Plaintiff's claims for age discrimination under the ADEA and race discrimination under Title VII easily survive summary judgment. There are simply too many factual issues for trial to allow the Court to grant summary judgment on these claims at this time.

### B. Race Discrimination in Violation of 42 U.S.C. § 1983 (Count Three)

Plaintiff also brings a § 1983 claim, parallel to her Title VII claim, against Defendant for race discrimination in violation of her Fourteenth Amendment rights when she was discriminatorily compensated less and selected for termination over her white peers. Section

---

[3] Defendant further argues its decision to terminate Plaintiff was race and age neutral is because Allen and Howard are both African American and over 40, and even though Tomino is not African American, she had recently recruited and hired Howard, who is. But those facts are not determinative, particularly in light of the other evidence produced in this case. *See Baker v. Macon Res., Inc.*, 750 F.3d 674, 677 (7th Cir. 2014) (rejecting the argument that because decisionmaker was four years older than plaintiff, an inference of age discrimination was implausible, and finding that any inferences about decisionmaker's motivation were for the trier of fact). The same goes for Defendant's argument that Allen could not have discriminated against Plaintiff because he hired her. *See Herrnreiter v. Chi. Housing Auth.*, 315 F.3d 742, 747 (7th Cir. 2002) (same-actor "presumption" of non-discrimination is for the trier of fact).

1983 provides that any person who, under the color of law, causes the deprivation of "any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. "[I]ndividual liability under § 1983 [generally] requires 'personal involvement in the alleged constitutional deprivation.'" *Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010) (citation omitted). Plaintiff does not name any individual defendants. Nevertheless, under *Monell*, a municipality, like Cook County, can be liable under § 1983 for a constitutional violation by its employee that was caused by: (1) an official policy, (2) a widespread practice or custom, or (3) an official with final policy-making authority. *Thomas v. Cook County. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (citing *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 690 (1978)); *see also Hahn v. Walsh*, 762 F.3d 617, 640 (7th Cir. 2014). To state a *Monell* claim under § 1983, a plaintiff must demonstrate that the "deliberate action attributable to the municipality itself is the 'moving force'" behind the deprivation of her constitutional rights. *Bd. of the Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 399 (1997) (citing *Monell*, 436 U.S. at 694).

Here, Plaintiff alleges that her constitutional injury was caused by Defendant's policy, custom, or usage because her termination was effected by "a member of Defendant's management team with final policymaking authority." (Dkt. 24) at ¶¶ 45–46. Under 110 ILCS 805/3-42, the Board of Trustees has the power to "employ such personnel as may be needed, to establish policies governing their employment and dismissal and to fix the amount of their compensation." (Dkt. 54) at 14–15. Plaintiff does not dispute that Illinois law gives a community college's Board the sole, non-delegable power to establish policies governing the employment and dismissal of community college personnel. Instead, Plaintiff argues that Tomino and Howard made the decision to terminate her, communicated her termination, and

16

implemented that termination in September 2014—while the Board did not approve officially of Plaintiff's termination until November 10, 2014. (Dkt. 59) at 14. To Plaintiff, this time delay is evidence that Tomino and Howard were "authorized to terminate Plaintiff's employment and [] the Board's approval of their decision was merely *pro forma*." *Id*. In addition to the delayed timing between Plaintiff's effective termination and the Board's approval of it, the parties dispute the "authority" that Howard and Tomino held to make personnel decisions. *See* (Dkt. 57) at ¶ 32; (Dkt. 62) at ¶ 32. Specifically, while Defendant argues that the statute deprives Howard and Tomino of any final policymaking authority, Plaintiff points to testimony that (1) Howard was "involved in" decisions to terminate Defendant's employees (both within and outside of the human resources department), and (2) Tomino's approval (or "sign off") was required for promotions and terminations. (Dkt. 60-3) (S. Tomino Dep.) at 19:24–20:13; (Dkt. 60-5) (D. Howard Dep.) at 23:13–27:12.

But neither Howard nor Tomino was a member of the Board and there is no evidence that Howard and Tomino set policy for hiring and firing employees. Although Plaintiff has submitted evidence that they were involved in or otherwise made employment decisions, that alone is insufficient to establish that they are policymakers. *See, e.g.*, *Carpanzano v. Coll. of DuPage*, 2004 WL 442606, at *5 (N.D. Ill. Feb. 18, 2004) (affirming dismissal of § 1983 claim against community college on summary judgment where plaintiff failed to submit evidence that individuals who terminated her had final policymaking authority); *Cameli v. O'Neal*, 1997 WL 351193, *18 (N.D. Ill. 1997) (holding that school district could not be held liable under § 1983 for personnel decisions of a school principal who was delegated authority to hire and fire employees but was not responsible for establishing district employment *policy*); *cf. Kujawski v. Bd. of Comm'rs of Bartholomew Cty., Ind.*, 183 F.3d 734, 739 (7th Cir. 1999) (finding a genuine

issue of fact as to whether the County Board delegated final policymaking authority to make employment policy decisions with respect to corrections employees where plaintiff provided evidence that the Board never reviewed Officer Parker's personnel decisions, Parker was "in charge" of the department, and Parker called community corrections meetings and set employment policies for the community corrections department, among other things). Accordingly, Plaintiff has failed to present sufficient to create a issue for trial as to whether Tomino and/or Howard were final personnel policymakers for Defendant, particularly where the statutory authority contradicts this conclusion. As a final point, Plaintiff has not offered any policy, practice, or custom that caused the pay disparity between her and her white colleagues that she has set forth, nor does she point to an official with final policymaking authority who was involved in the salary decisions. Accordingly, Plaintiff has failed to put forth sufficient evidence to allow her § 1983 claim to survive summary judgment.

## **CONCLUSION**

For the reasons stated above, Defendant's motion for summary judgment (Dkt. 53) is granted in part and denied in part. Plaintiff's § 1983 claim is dismissed, but her ADEA and Title VII claims will proceed to trial.

_____
Hon. Virginia M. Kendall
United States District Judge

Date: March 26, 2018